Good morning, ladies and gentlemen. Our first case for this morning is Teamsters Local No. 727 v. L&R Group of Companies. I believe Mr. Campbell is up. May it please the Court. My client, the L&R Group of Companies, asked that the Court reverse the District Court's decision with respect to the Teamsters Fund's delinquent contribution claim and with respect to— Counsel, what is the L&R Group of Companies? Your brief says it's not a corporation, and I tried to figure out what it is and couldn't find that it even exists. So the L&R Group of Companies, they are a conglomerate of other entities that own parking facilities around— Well, I think we need to know what it is. Rule 17 says that litigants must have the capacity to sue and be sued. And if this is just an umbrella name for other companies, it doesn't have the capacity to sue and be sued. All the briefs talk about is contributions owned by something called system parking, which doesn't appear to be a party to this case. And then we have a separate problem under Rule 17 about the fact that litigation has to be in the name of the real party in interest. So I, at least, would like to know what system parking—sorry, what L&R Group of Companies is and why it is the proper litigant. So system parking was an entity that owned facilities here in Chicago. The L&R Group of Companies, it's just a name. They do business at the L&R Group of Companies. That's the problem. If it's a name, you can't sue a name. You have to sue a juridical entity. System parking may be an entity. There may be some corporation that's the right entity. But a name, a trade name, a business name, is not something you can sue. It's not a juridical entity. So we need to know exactly what the L&R Group of Companies is and why it exists and why it's a permissible litigant in this case. Well, all I can tell the court is that it is a name, and these companies operate— You can sue a corporation. You can sue a limited liability company. But you can't sue a name. Actually, the Supreme Court held that in a famous case called Fortune v. Schiavone, which said you couldn't sue Fortune. It's a magazine, but the entity was Time, Inc. So who is the entity here? We need to know that. So I would submit to the court that during the audit period, the entity was system parking. So I wonder, so that we can move on for the rest of your argument, I'm going to ask you to file with the court within seven days a statement that describes, that tracks us through from system parking, which I take it is a corporation, but you need to confirm that. Who owns it now? Who is either the individual human being or the corporation or the LLC or whatever it is that owns this, not just a trade name L&R group of companies, unless that somehow got incorporated somewhere, although you say in your disclosure statement that it's not a corporation. But if you could give us all of the pertinent details about that, you can move on at this point in your argument. We will do that, Your Honor. So we're asking that this court reverse the district court's ruling with respect to the delinquent contribution claim and also with respect to L&R's counterclaim for restitution, because they were clearly erroneous based upon the facts and there's no legal support. With respect to the delinquent contribution claim, the court opens its order by saying that in order for the funds to prevail, they must show that the defendant failed to make contributions in accordance with the collective bargaining agreement. So let me tell you the most significant problem I have with your position. If you look at the fund agreements and if you look at the district court opinion, the obligations to contribute are essentially employee by employee. Some people are full-time, some people are part-time, some people have a certain job description, other people have a different job description, and all of those things factor in. But what the contribution article says is that each employer agrees that there should be an absolute obligation to the trust fund, that is to say to give these contributions, and the funds were looking in that sense about the contributions that were brought. They made it very clear to your clients that they were not looking for overpayments with respect to any particular person, and they also invited you on several occasions to come to them with solid numbers to show overpayments, and you never did, not with any kind of audited statement prepared by a certified accountant of some type, some expert. And so it seems to me it's entirely okay for them to see what's supposed to come in from our point of view, and if there's something else, the ball was in your court and you dropped it. With respect to after the audited came out, there were various meetings that L&R had with the funds trying to figure out how they were calculating it. I understand, and the fund kept saying if you think there's a problem with overpayment, you need to do the research, you need to come back and give us the numbers, and you didn't. We did. Not in any kind of time, not with any kind of solid numbers. Your Honor, the record would show that within 2009, after several meetings, L&R did come back with a calculation that showed there were at least $220,000 in overpayment. The funds took that and they said, you know what, you're right. Then they changed the way they calculated it. Because they went back, they gave you the credit for that, and they said, but you've made a different mistake, which was looking at hours worked instead of hours paid. And when they went through and scrubbed the whole set of numbers for that, it turned out that it netted out in a way that was unfavorable to you. Because it wasn't only L&R that would have made that calculation. That's exactly how the funds calculated their initial preliminary audit. So when they came back after we said there's $220,000 of overpayment, they came back and said, oh, but wait, we've changed the way we calculated. There's really $300,000 that you really owe. They didn't change so much as, remember how this all works. Month to month, there'd be a statement from the funds. We think this is what you owe. But there was all sorts of language in those statements saying that it's up to you to check this. You're the ones, after all, with the payroll records. You're the ones who can figure it out. You're certifying that these payments are correct. And you did that for years with an employee who apparently wasn't doing her job very well. But that's what you did. I agree that we did that. But also part of this process is the funds send out each month a contribution report, and it has listed on there all the people that contributions are to be made for. And the funds even admits that when our employee, when Eleanor's employee, would cross names off and submit it to the funds, there would be times that the funds would just miss it. And so they end up sending back the report, and our employee is filling it out. And so these are just mistakes that are made. But I want to go back to, if I could, the fact that the funds have to ‑‑ I understand that. And I'm saying the funds told you we are looking for underpayments. We are not your auditor. And so, again, on this employee by employee basis, if the exact right amount was paid, that was fine. If not enough was paid, they counted it as an underpayment. If too much was paid, as they told you repeatedly, they just zeroed it out. Nobody was hiding anything. They were entirely plain about that methodology. They have ‑‑ the way this works ‑‑ Why did they have to do your work? Auditing is expensive. It's a mystery to me why with this much money at stake. You didn't just go out and hire an auditing firm to do this work for you. If you had all your payroll records, it seems like it would have been worth the fee. But you didn't do that. We did it internally. Well, not with somebody with any kind of qualifications. Well, I disagree. Because if you look at Mr. Marino, who is the person who did the funds audit, he's not a CPA. He's not an accountant. Right. That's the point.  He took care to figure out the CBA language. He looked over the detailed reports that the funds provided. He flew to Chicago to meet with the funds to figure out that he was calculating it the same way. And then he directed the calculation of the audit. So there's no law that says you have to have an independent third party who is an accountant to do an audit. Because Mr. Marino wasn't, and I'd argue that Mr. Marino wasn't independent. He had been doing all the audits for the funds since 2003, and he did whatever the fund manager told him, even though it wasn't required by the fund trustees or the fund trust agreements. I want to get back to something that Judge Wood raised, but I want to see if you can answer this directly. Why should the funds be penalized for the employer's failure to supervise its own employee in accurately calculating and submitting contributions? I would submit to the court, I don't believe that the funds are penalized. The funds did an audit. Mr. Phillips, who owned system parking at the time, was under the understanding that any future audits, because they had dealt with this before, any future audits would include overpayments. That's what he believed. But the funds were crystal clear when this started that that's not what they were doing. And there's no written record of that undertaking. And the funds actually take the position that it would be inconsistent with ERISA for them to undertake something that would be to the detriment of the funds. In other words, pay money out of the funds to you. So we've stressed, particularly with multi-employer funds, the essential role that written documentation of obligations plays. I would just submit to the court that there is nothing. Plus, the funds didn't instruct B&K to manipulate the audit report. The fund director did. No, that's not a manipulation. They wanted a specific calculation as it related to overpayments, but it wasn't a manipulation of the audit because it wasn't like a real audit, like an independent audit. They claim it's independent, but they were doing an audit to determine whether there was a delinquency. Right, to determine whether there was an underpayment. And that was the purpose of this audit. Suppose you take an alleged overpayment. You might say this looks like an overpayment. Before you know it's an overpayment, you've got to dig into the records. You've got to see, was this person, for example, correctly characterized as part-time or should they have been full-time? Was there a problem with vacation pay being either counted or not counted? It's something that requires a positive amount of work to do, and so resources would have to be put into checking these overpayments, as opposed to just saying, okay, in this instance it doesn't look like there was an underpayment, so we're going to put this off to one side, move on to the next employee. I disagree. Well, you can disagree if you want to, but it takes some work to figure out whether there's been an overpayment. And it takes work to do the audit, and that's exactly what they were doing. And why did they have to do your work? Why did they have to do work that was going to give money back to you? I'm not asking them to do our work. Yes, you are. I'm asking them to do what they were supposed to do, which is to find that whether or not there were consistent contributions based upon the collective bargaining agreement. So every time that the funds looked at a person, they had the payroll records, and when they looked at those payroll records, it was simple to determine, were there any hours worked? If there weren't any hours worked, then there were no contributions that were due. They then just zeroed it out. So there's no more work in doing the full audit than doing what they did. They intentionally went in and said, anytime there's an overpayment, we're going to claim that it's consistent with the collective bargaining agreement, even though there were no hours worked for those people. Well, you are assuming that they had a duty to figure out the amount of the overpayments and net everything out. That's actually the question. It's not something you can start with an assumption. They invited you to come to them from the very first conversation when your guy said, oh, I thought you were going to do overpayments as well. And they said, no, we aren't. But they said, you can come back to us. And that's the moment when you didn't come back to them. You waited a couple months and months. We waited and they waited. And there was this back and forth where they were trying to do. They didn't need to do anything, though. It was your job, they said, to show the overpayments, and you didn't. And we did. We showed some overpayments early on. Then they modified how they calculated it. And then Mr. Francis got involved, and he came back and did the audit and showed what the overpayment was. And I'll reserve the balance of my time. That's fine. All right, Ms. Martin. Good morning, Your Honors. May it please the Court, my name is Linda Martin, and I appear before you on behalf of the Teamsters Funds. So, Ms. Martin, let me turn this around.  And have the program spit out at least the obvious overpayments before you accuse them of being, you know, so deeply in the hole? I mean, I don't see what the huge amount of work is here. Well, Your Honor, system parking and L&R would have had to have proved to the funds that, one, the overpayments were a mistake of factor law, and, two, that the equities required or favored that they be given a credit or a refund. And that just didn't happen in this case. L&R is asking the funds to pay their auditor to make these assumptions and make these determinations that are really, truly the funds' trustees' obligation to do because they're the fiduciaries. And they can't take that at face value. You know, they can't just give back a million and a quarter dollars on face value. They really need to have that proof so that they can justify, if the equities show it, that they should be making that repayment. So, by the way, are we talking about a period when all of the payments were coming from system parking? Or do you have any light to shed on this L&R group of companies question? Your Honor, the period covered by the audit, during the period of the audit or the period covered by the audit, system parking was the employer. And system parking had a collective bargain agreement with Teamsters Local number 727. And at some point, I think it's September 2010, L&R purchased system parking. Whoever L&R is must have had a bank account somehow. Right. And when they purchased system parking, Your Honors, they assumed the terms of the collective bargain agreement and the obligations under the collective bargain agreement. But who is they? Who is they? Mr. Campbell said that L&R group of companies is just a name. It's not a legal entity. At least that's what he said. Your Honor, I don't have the answer to that question. You must have some view of that because it was, after all, the Teamsters funds that sued, that named the L&R group of companies rather than system parking or anyone else as the defendant. Who do you think is liable on this judgment? If you get a judgment against a name that is not a juridical entity, how do you collect it? Your Honor, we collect it from L&R because L&R assumed the terms of the collective bargain agreement. No. Mr. Campbell told us that there is no L&R. Now, he may be wrong, but if it's just a name for something else, then you presumably have to collect it from the something else, whatever that is. Your Honor, when they purchased system parking, system parking was no longer an entity. All we had was this L&R group who came to us and dealt with us under the collective bargaining agreement. They assumed that contract. You're just assuming that L&R exists as a juridical entity, and that's the question. I do understand your question, Your Honor, and I apologize. I don't have an answer to that today, but I would be happy to join in the briefing on that issue. That would be fine. Thank you. We will expect also seven days for you. Thank you. So the question then really boils down. So you've really, in a sense, moved straight to the law on restitution and saying that even if there was some kind of overpayment, that in and of itself is not enough to require an order. Are we pretty clear on these numbers that people are throwing around about how much was underpaid, how much was overpaid, how that all nets out? Your Honor, I believe the auditor's final report, as Judge Alonzo found, was accurate and correct. One, Mr. Marino, the auditor, testified in detail about how that audit was done. But in addition to that, William Francis, who was a witness for L&R, testified that when he went through the funds auditor's audit, that wherever they looked and made a determination that there was a deficiency, that that was correctly calculated. So they pretty much admitted that the delinquency amount that the auditors found was an accurate amount. What their quarrel is is that they should have automatically been given a credit and that they should never have had to have proved that if there was an overpayment, which they never really established, that it was a mistake of fact or a mistake of law and that the equities required that. Judge Alonzo, in their favor, made the decision that that employee was not a rogue employee. She just didn't do her job well, as you had pointed out. But it's more than that. It's more than that. So is this really just about who bears the risk of loss of that employee's failure to do her job well, her negligence essentially, and the fact that over some five- or six-year period of time she isn't monitoring the bills that come in from the funds? That is our position, Your Honor. And as Judge Alonzo very aptly pointed out, of the $1.25 million that L&R is seeking as restitution, two-thirds of that, two-thirds of the alleged overpayments were made five to seven years ago. Two-thirds of the $1.25 million is roughly $829,000. That mistake was made over and over. She was never supervised. No one ever double-checked her records. But yet they certified month after month after month to the funds that this is the correct amount of hours and this is the amount of contribution. The funds don't have the payroll records. They have to rely on the employer to be honest and truthful and correct. And they do an audit to make sure that they actually were correct and that they honestly gave us the amount of money that was owed. The burden is not on the funds to look for and show them that perhaps they made a mistake. They're supposed to check their own records. They should be auditing their own records. You know, that's just not, we're not able to do that. Except that it does seem that in the course of doing your audit, it became apparent, I guess there were different situations. Maybe some situations were murkier than others, but it seems to have become apparent that there were some overpayments. But let me ask you this. In the record that now is before us, is there any clear indication how these alleged overpayments relate to different funds? Because you actually have three funds here. So if L&R under-contributed to Fund A but it over-contributed to B, is that a problem? It's not clear from the report that L&R has submitted, Your Honor. And at trial, there was no evidence explaining the assumptions that Mr. Francis made. There was no evidence how he interpreted the collective bargaining agreement and how he applied that. And there was never a breakdown, as you're asking, of what constitutes that one and a quarter million dollars. It's essentially, you know, they did this to the fund, they did this to the trial court, and they're saying it to you today, Your Honor. Here's our report. You look through it. You figure it out. You do the math. And I'm sure if you do it, you'll agree with us. But it's not how it works. We need to understand, you know, did you – they had calculations that differed from the auditors. Well, why? Was that based on your interpretation of the collective bargaining agreement? Did you look at the payroll records, which they admitted they never did when they did their report? Did you look at the payroll records and see if that employee was a full-time employee or a part-time employee? It makes a big difference because a part-time employee can get full-time benefits depending on the number of hours that they work in a given period of time. So if they had come back to the funds with their own audit, done with methodologies that are generally accepted in the accounting profession, is it the case that the funds, you know, just even in a hypothetical situation, will accept a report like that and sit down and work out what a net payment due is? Or is it a more absolute approach on the funds part? It's a more absolute approach on the funds part, Your Honor. And I would just add to your question, or my answer, that what they are saying is an audit really is not an audit. The funds auditors looked through the payroll records. Mr. Francis admitted that he never did. You know, a true audit would look at the payroll records and reconcile, as you said earlier, employee by employee by employee. That just never happened. Assumptions were made but never explained. You know, interpretations were made but never explained. The funds would need that information, Your Honor, to make a determination as to whether or not there were really overpayments and what the overpayment amount would be. We may not agree with their interpretation. We may have to work that out with them. And as you aptly pointed out earlier, they had approximately 16 months from December 2008 when they received the preliminary report until April 2010 when we got the first letter saying you owe us money. They never, ever explained anything to us. And, in fact, Your Honors, we didn't even get their report until months later. And when we did, there was no explanation. It was here it is, you figure it out. So their response to that, I think, in part is, yes, Mr. Francis didn't dig into the payroll records, but if I'm remembering correctly, they said he simply accepted the B&K data about what the payroll records would show. And they say, how can you object to that? We can object to it, Your Honor, because Mr. Francis also testified. He gave one example where he recalculated the amount. He reduced the amount of the contribution that he believed was owed for someone. It was an employee who had worked 98 hours in that month. A full-time employee can take vacation time, can be sick for a couple of weeks, and would still get that full-time contribution. He never looked at the payroll records to make that determination. Okay, because I was going to ask you that. That's one example then where, even though it might look like the hours are low, they aren't really. So I wondered, so you think vacation, maybe FMLA or some other? Or sick time. You know, they may have been entitled to sick time. In the collective bargaining agreement, we believe it's clear, and Judge Alonzo ruled in our favor on that, that paid time off, which would be your sick time, your vacation, your bereavement, your personal time off, must count as hours worked in order to get that contribution. And that applies to part-time and full-time employees, which is why it's so critical that you have the payroll records and you go through those payroll records. And just accepting the hours that B and K notes in their report just isn't sufficient enough without the payroll records. Okay. I see no other questions. If there's anything else you'd like to tell us, you're free to do that. Your Honors, and I would just do this quickly, I would just reemphasize to you, you know, the equities in this case. That system parking and L&R subsequently, there was a 16-month gap from the time of the preliminary audit until we received our first notice that there were overpayments, but there was no proof. Again, most of these alleged overpayments were five to seven years ago, approximately $829,000. I don't think it's the fund's responsibility to reimburse someone who didn't do their own job in checking their own records. And as the judge noted, the funds are in bad shape. They've been deficit spending for years. And by example, the Health and Welfare Fund at the time of trial only had five months of reserves, but they have 5,500 participants and beneficiaries. To give back hundreds of thousands of dollars that allegedly were overpaid five to seven years ago would really significantly damage the stability of those funds. They're asking to use money that the funds have today to pay for benefits to current members and their beneficiaries. And we don't believe the equities require that that occur. And I thank you, Your Honors, for your time. Sure, thank you very much. Anything further, Mr. Campbell? First, Your Honor, I would submit to you that the record, if you look into the record and you look at L&R's audit, and when you look up at the top right-hand portion of it, it's going to show you the breakdown. It's going to show you how much was overpaid for health and welfare, how much was for pension, how much was for legal and educational. I would also submit to you that the funds had all of the payroll records because L&R submitted it to them, and the funds put the information from those payroll records in their individual detail reports, and that's exactly what Mr. Francis used in creating L&R's audit. We'd also submit to the Court that the equities do favor restitution here, but we believe that the Court should be looking at the delinquency in the first instance to say, is there actually a delinquency, and then get to the focus of the counterclaim, which is, is L&R entitled to restitution? In essence, what the fund is asking is that by their accounting method in their audit, that they can show that there is a delinquency even though they had $1.2 million more than was owed. What they're looking for is the difference between what the funds claim is their deficiency or delinquency and what L&R claims is the overpayment. L&R's audit just completes the full audit that the funds should have been doing and that it wouldn't have cost the funds any more money to do because they already had all the information and they just zeroed it out. They knew and they know exactly how much money they have of L&R's. We'd submit to the Court that our briefing on these matters and ask that the Court reverse the district court. Thank you, Your Honor. Thank you very much. Thanks to both counsel. We'll take the case under advisement.